UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANTRAZ J. OLIVER-MCCLUNG,

                Petitioner,                  Case Number: 2:18-12067
                                                  HONORABLE SEAN F. COX

v.

ERICK BALCARCEL,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Dantraz Oliver-McClung filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his convictions for three counts of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1)(d)(ii), and four counts of assault with intent to commit criminal sexual conduct involving penetration, § 750.520g(1). Petitioner, who is proceeding *pro se*, raises nine claims. Respondent argues that a portion of Petitioner's first claim is procedurally defaulted and that all of his claims are meritless. For the reasons set forth below, the Court denies the petition and denies a certificate of appealability.

## I. Background

Petitioner and his co-defendant Carlos Love were tried together before separate juries.

The Michigan Court of Appeals summarized the evidence presented at trial as follows:

> On March 5, 2014, Shantia Smith, the complainant, was at a birthday party in a one-bedroom apartment. Smith, who was 19 years old at the time, testified that there were about eight or nine boys at the party and about six girls. Love

and Oliver-McClung were both at the party, and almost everyone, including defendants and Smith, was smoking marijuana.  Smith testified that, at some point, everyone was playing a drinking game during which she indicated that she had never had a threesome.  She testified that around that time, the males started "grabbing on" the girls.  She said that a male with sideburns tried to grab her and get intimate with her.  The male, whom Smith referred to as "Sideburns," made her uncomfortable, and she went into the hallway outside the apartment because it was getting crowded inside.

Smith testified that Oliver-McClung came into the hallway and talked to her.  She testified that he was being nice, that she thought he was "pretty cool," and that she became more relaxed and returned to the party.  Smith testified that Sideburns approached her, tried to talk to her again, and that the situation became aggressive again.  She testified that Sideburns grabbed her arm and pulled her toward the bedroom.  She said that Oliver-McClung followed and another individual with a medium build, whom she referred to as Medium, approached from another direction.  Smith testified that she grabbed the doorway to the bedroom and called out for Destiny Herring, who was at the party, but Herring acted like she did not hear her.[2]

Smith testified that Sideburns, Medium, and Oliver-McClung all pushed her into the bedroom despite her attempts to push them off.  They closed the bedroom door and Sideburns pulled down her leggings.  Smith testified that she pulled her leggings back up and tried to leave, but the door was blocked by Medium and Oliver-McClung.  She testified that she yelled "stop" and "no," and that Sideburns, who was standing behind her, pulled her leggings back down and said, "You've been saying 'no' to me all night."  She testified that he shoved her down and vaginally penetrated her with his penis while Medium and Oliver-McClung were standing in front of her.  She testified that she tried to stop it from happening.  She also testified that Sideburns tried to penetrate her anus with his penis, but that he failed to do so.

Smith testified that after vaginally penetrating her, Sideburns tried to force her to have oral sex with Oliver-McClung and Medium by pushing her head toward them while their pants were down.  She testified it was so dark in the room that she could not see their penises, but she knew that they were out of the assailants' pants because they touched her face.

Smith went on to testify that after Sideburns was finished, the men switched positions, and Oliver-McClung vaginally penetrated her from behind. She testified that she did not want Oliver-McClung to do so and that she tried to

stop him. She also testified that Medium continued to try and force her to give him oral sex while Oliver-McClung penetrated her vaginally.

At some point another individual that Smith identified as Love entered the room. Smith testified that it was very dark in the room, but that when Love opened the door to come in light from the hallway momentarily shone into the room. She testified that after Oliver-McClung finished, Love vaginally penetrated her from behind with his penis. She testified that she did not want Love to do so and that she tried to stop him.

Smith testified that three, maybe more males, penetrated her vaginally, but she did not know if any of them ejaculated. Further, she testified that each male who penetrated her held her down during the assault so that she could not get up. She also testified that while Love and Oliver-McClung were in the room, someone said that if she just gave someone oral sex it would "be over with." She estimated that the assaults lasted approximately 45 to 50 minutes.

After the sexual assaults were over, Smith left the apartment, went to the stairs in the building, and sat there. She testified that she saw the males leave together and then went back into the apartment to charge her phone. In the apartment, she was crying on the bedroom floor when Herring and Anderson entered the room and asked her something.[3] She testified that she did not respond because she felt like she was set up. She called her best friend after her phone was charged, but did not tell her what happened and instead just cried. Smith's sister then called her, and Smith asked to be picked up. She did not tell her sister what happened. Before her sister arrived, a male friend of Smith's arrived and she spoke with him in the building's common laundry room. While they were speaking, she saw Love and Oliver-McClung's brother go into the apartment.[4]

Smith testified that she went outside and saw that her sister and mother had arrived. She stated that she started crying and told her mother what happened. Her mother called the police and Smith was taken by ambulance to the hospital. A sexual assault nurse examiner (SANE) examined her and a rape kit was done. The SANE nurse testified that Smith did not have internal or external injuries. She explained, however, that the lack of injuries was not unusual due to the elasticity of the vaginal tissues. She also testified that she took samples from Smith's vagina and anus. A forensic scientist with the Michigan State Police testified that while the DNA of two men was found in the samples, both Oliver-McClung and Love were excluded as donors.

3

Detroit Police Officer Stanley Suski responded to the scene around 3:11 a.m. He testified that he knocked on the apartment door, but did not hear any movement or noise inside. He left around 5:26 a.m. Herring and Anderson testified that several people, including Love, went to sleep in the apartment. Herring testified that she was asleep when the police knocked; however, she sent a text message to Gina Hawkins, another party guest, stating that the police were at the door. Herring testified that she later woke up to the sound of someone knocking and saying that there was a fire. She testified that they left the apartment and that some of them went to Love's apartment.

Captain Winston Farrow was called to testify regarding a fire that consumed most of the apartment building a few hours after the party took place. Farrow, a fire and arson investigator, testified that the apartment building was on fire when he arrived and that it took two days to extinguish the fire. The most damage to the building was in the corner where the apartment at issue in this case was located. Although a trained dog detected a petroleum-based product or accelerant, the water used to put out the fire diluted the dog's ability to find the accelerant. Captain Farrow testified that, although he did not believe it was an electrical fire, he was unable to rule it out and he could not determine conclusively what caused the fire.

After Smith returned from the hospital, the police showed her a photo array of six photographs that included Oliver-McClung's picture. She identified him as one of her assailants. The police also showed her a photo array of six photographs that included Love's picture, but she did not identify Love or anyone else in the array as an assailant. Later that day Smith looked at photos of the party that were posted on Herring's Facebook page. At least one of the posted photos included Love and she recognized him as one of her assailants. She took a screenshot of the picture and gave it to the police. The next day she selected Love from an in-person lineup at the police station.

Other evidence was presented against Love. Anderson and Herring testified that they were asked to go to the police station and that Love went with them. They both testified that on the way, Love instructed them to lie to the police and that, based on his request, they did so. Additionally, there was testimony that after the preliminary examination, Love's mother and an older man went to Smith's house. Smith testified that Love's mother asked her if she was "sure" that Love committed the crime and asked if they could "take this a different way." Smith testified that the man accompanying Love's mother offered her some money, but that she did not take it. After they left, Smith contacted the police and provided a statement that included Love's mother's

phone number.  Love's mother denied offering anyone money and denied visiting Smith.  She testified that Smith had probably obtained her phone number from a police detective.  Anderson and Herring also testified that Love's mother contacted them regularly after Love was arrested after which they gave Love's mother written statements identifying three men other than Love and Oliver-McClung.  Love's mother, however, denied the frequency of her visits to Herring and Anderson and testified that she did not tell the girls what to say in the written statements she picked up from them.

_____

[2]Herring testified that she did not know what happened in the bedroom.  She stated that Smith walked into the bedroom with only Oliver-McClung and that no one else joined them.  She further testified that at some point Smith and Oliver-McClung left the room after which Smith went into the bedroom with a second male and that this process was repeated with a third male.  Herring added that at some point Love went into the bedroom while Smith was already in there with one or two other males.  Alison Anderson, another party guest, testified that she saw Smith grab Oliver-McClung's hand and walk into the bedroom with him.  She testified that a lot of males went into the bedroom after Oliver-McClung came out, including Love.  She testified that she was upset because she had planned on being with Love that night and she thought that Love was doing something sexual with Smith based on the way he went into the room and came out.

[3]Herring and Anderson both testified that they saw Smith on the bedroom floor, but they said she was not crying.

[4]Herring testified that she found Love's phone in the apartment and called him to let him know.  Herring and Anderson testified that Love and Oliver-McClung's brother then returned to the apartment.

*People v. Love*, No. 324992, 2016 WL 3945875, at *1-3 (Mich. Ct. App. July 21, 2016)

Following a jury trial in Wayne County Circuit Court, Petitioner was convicted of three counts of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1)(d)(ii), and four counts of assault with intent to commit criminal sexual conduct involving sexual penetration, Mich. Comp. Laws § 750.520g(1).  On November 20, 2014, Petitioner was sentenced to 14 to 30 years for each first-degree criminal sexual conduct conviction and 5

to 10 years for each assault with intent to commit criminal sexual conduct conviction, all to be served concurrently.

Petitioner filed an appeal in the Michigan Court of Appeals raising nine claims for relief.  The Michigan Court of Appeals affirmed Petitioner's convictions, but held that an offense variable had been incorrectly scored and that the correct scoring changed the guidelines range.  *Love*, 2016 WL 3945875 at *3.  The court remanded the case to the trial court for resentencing.  *Id.*  The court also ordered that, if the trial court imposed costs on resentencing, the trial court was required to establish a factual basis for costs imposed.  *Id.*

Petitioner filed an application for leave to appeal in the Michigan Supreme Court.  On June 27, 2017, the Michigan Supreme Court denied leave to appeal.  *People v. Oliver-McClung*, 500 Mich. 1020 (2017).

On remand, the trial court resentenced Petitioner to 126 months to 30 years for the first-degree criminal sexual conduct convictions and to the same sentences of 5 to 10 years imprisonment for the assault convictions.  *People v. Oliver-McClung*, No. 351290, 2021 WL 1050128, at *1 (Mich. Ct. App. Mar. 18, 2021).

Petitioner then filed the pending habeas corpus petition, raising these claims:

I.      Prosecutorial misconduct deprived Mr. McClung of his due process right to a fair trial.

II.     The trial court abused its discretion by denying Defendant's motion for mistrial.

III.    The trial judge engaged in substantial and material misconduct during his questioning of Destiny Herring in a violation of Mr. McClung's constitutional due process right to a fair trial.

6

IV.     The trial court erred in denying Petitioner's motion in limine to preclude evidence of the alleged arson.

V.      The trial court abused its discretion by refusing to give a consent instruction.

VI.     The trial court erred in precluding the petitioner's counsel from impeaching Byrd with regard to his involvement with the gangster disciples and past deals with the prosecutor.

VII.    The trial court violated the petitioner's rights at sentencing by mis-scoring offense variable 10 of the sentencing guidelines.

VIII.   Should the assessment of $600.00 in "court costs" as part of Petitioner's sentence be vacated, as those costs were not authorized to be imposed in this case by a specific legislative act?

IX.     Petitioner was denied his state and federal constitutional right to the effective assistance of counsel, where trial counsel failed to request a limiting instruction.

## II.     Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of

law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 408. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Further, "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id.*

A state court's factual determinations are entitled to a presumption of correctness on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.   Discussion

## A.   Prosecutorial Misconduct (Claim I)

In his first claim, Petitioner argues that the prosecutor's misconduct deprived him of his right to a fair trial.  Specifically, he argues that the prosecutor: denigrated defense counsel, denigrated witness Shaquita Wright, improperly appealed to the sympathy of the jury, shifted the burden of proof, elicited inadmissible hearsay testimony, argued facts not in evidence, and asked leading questions.[1]

Respondent maintains that the majority of these claims are procedurally defaulted. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525.  In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of these claims.

A prosecutor's misconduct violates a criminal defendant's constitutional rights if it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Prosecutorial misconduct entails much more than

---

[1]  Petitioner does not expand on these claims in his habeas petition.  Because he clearly intends to raise the same prosecutorial misconduct claims raised in state court, the Court considers Petitioner's brief filed on appeal to the Michigan Court of Appeals to clarify these claims.

conduct that is "undesirable or even universally condemned." *Id.* at 181 (internal quotation omitted). To constitute a due process violation, the conduct must have been "so egregious so as to render the entire trial fundamentally unfair." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (citations omitted).

The *Darden* standard "is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (alteration in original). "That leeway increases in assessing a state court's ruling under AEDPA," because the court "'cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites ... other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable.'" *Stewart v. Trierweiler*, 867 F.3d 633, 638-39 (6th Cir. 2017) (quoting *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015)).

1.    Denigrating defense counsel

Petitioner argues that the prosecutor denigrated defense counsel during his cross-examination of two prosecution witnesses, Shantia Smith and Michael Byrd.  Defense counsel attempted to impeach Smith by asking whether a contrary statement made in "one of her reports" was wrong.  *Love*, 2016 WL 3945875, at *12.  The prosecutor objected on the ground that the referenced report was an investigator's report not Smith's report and accused defense counsel of intentionally mischaracterizing the evidence.  *Id.*  The prosecutor also accused defense counsel of taking a "cheap shot" during cross-examination of prosecution witness Byrd.  *Id.*

The Michigan Court of Appeals held that the prosecutor's objection that defense counsel mischaracterized the evidence was merited, but the prosecutor "likely should not have then suggested a *deliberate* mischaracterization."  *Id.* (emphasis supplied).  Nevertheless, the court held that "any minimal prejudice was alleviated by the trial court's instructions." *Id.*  The court of appeals also held that the prosecutor's allegation that defense counsel was taking a "cheap shot", although improper, was "too fleeting and unremarkable" to rise to the level of implicating Petitioner's right to a fair trial, particularly because the jury instructions served to alleviate any prejudice.  *Id.*

The Michigan Court of Appeals' decision was reasonable.   The prosecutor's comments were brief and isolated and, coupled with the trial court's instructions, did not deprive Petitioner of a fair trial. *See Givens v. Yukins*, No. 98-2429, 2000 WL 1828484, *7 (6th Cir. Dec. 5, 2000) (finding no due process violation where the prosecutor stated that

defense counsel was taking "cheap shots").

During closing statement, defense counsel argued that Petitioner already had been judged not guilty by a jury of his peers. Defense counsel reasoned that not one of the ten to twenty people who were at the party on March 5th came forward to say that Petitioner was guilty. Petitioner maintains that the prosecutor's rebuttal was an improper attack on defense counsel:

> [Oliver–McClung] wants a jury of the defendant's peers to judge him. This was good. He would like Destiny Herring and Alison to sit where you guys are sitting instead of you all because they've already made the judgment.
>
> ...If he's going to sit there and say a jury of his peers already acquitted him, well, ... this is probably the worst argument of all. This was his worst argument, that she had some sort of perception problem.

*Love*, 2016 WL 3945875, at *13.

The Michigan Court of Appeals held that the prosecutor's comments were an appropriate response to defense counsel's argument. *Id.* One factor used in evaluating claims of prosecutorial misconduct is whether the prosecutor's statement was "invited by or was responsive" to the defense. *Darden*, 477 U.S. at 182. The record supports the conclusion that the prosecutor's rebuttal was responsive to defense counsel's closing. Petitioner has failed to establish that this argument was improper or that it rendered his trial fundamentally unfair.

Petitioner also objects to the prosecutor's argument that the defense failed to extensively cross-examine the sexual assault nurse examiner and failed to provide any contradictory testimony. The Michigan Court of Appeals found the argument responsive to

12

defense counsel's suggestion that the absence of any physical injury to Smith undermined her testimony. *Love*, 2016 WL 3945875, at *14. It was reasonable for the Michigan Court of Appeals to conclude that the prosecutor's argument was a fair response to the defense's closing, and that, considering the evidence against Petitioner and the trial court's curative jury instructions, the prosecutor's argument did not deprive him of a fair trial.

Finally, Petitioner argues that the prosecutor personally attacked defense counsel by characterizing the defense as one grounded in victim blaming and shaming. The Michigan Court of Appeals held that the prosecutor's comments were not improper because they were in direct response to defense counsel's argument that Smith was at a late night party, drinking and smoking marijuana. *Love*, 2016 WL 3945875 at *14. The prosecutor's argument, read in context, was not an attack on defense counsel or the defense. Instead, it was a reasonable response to the defense's closing and based on the totality of the evidence presented. In addition, the judge reminded the jury that nothing the lawyers said counted as evidence. The state court's denial of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### 2. Denigrating witness Shaquita Wright

Petitioner next challenges the prosecutor's questioning of co-defendant Love's mother, Shaquita Wright. After Wright was non-responsive to questions on direct examination, the prosecutor stated, "I'm asking you a different question. Don't worry. These attorneys are going to ask you some questions, okay, and they get to clean up the mess that

you make, all right?" (ECF No. 11-13, PageID.1608.).  The trial court sustained the objection and directed the jury to disregard the prosecutor's comment.  *Id.*  The court also advised the jury during final instructions not to consider anything that had not been admitted into evidence.  A jury is presumed to have followed a trial court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  For these reasons, the Court concludes that the Michigan court's resolution of this claim was not contrary to, or an unreasonable application of, *Darden*.

        3.     Appealing to juror sympathy

Next, Petitioner argues that the prosecutor improperly appealed to the jury's sympathy during closing when he asked the jury to recall Smith's demeanor on the stand when Smith was asked to recount the assault.  She continued:

> During the questioning for the most part, she was fine until we got to one point. Until we got to – let's talk about what happened in the room.  The very first penetration, you saw her.  She sat there.  She was still.  She couldn't move, her eyes fixed on you, shaking her leg like I've never seen before.  She couldn't answer the question.  I had to get her off to a new question. There was a moment of silence there that you cannot, cannot create with Hollywood, okay.  That's why the law tells you you can believe a person on their word and their word alone. That's why.

*Id.* at *14.

The state court held that the prosecutor properly asked the jury to consider Smith's demeanor when assessing her credibility.  Prosecutors "must obey the cardinal rule that a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (internal quotation omitted).

14

A prosecutor does not overstep by appealing to the jurors' sense of justice. *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009). The prosecutor's language was not inflammatory nor does it appear intended to incite passions or prejudices. Instead, it echoed the jury instruction that a jury may consider how a witness "look[ed] and act[ed] while testifying" when assessing credibility. (ECF No. 11-15, PageID.1986.) The Court finds that the prosecutor's argument was not improper.

### 4. Shifting the burden of proof

Next, Petitioner maintains that the prosecutor improperly shifted the burden of proof in his rebuttal argument by asking "[W]hat does this say if your own brother wouldn't come to court? What does it say?" (ECF No. 11-14, PageID.1838-39.) The Michigan Court of Appeals held that the argument was proper because it specifically responded to the defense's argument that a jury of Petitioner's "peers" (the partygoers) had judged him innocent. *Love,* 2016 WL 3945875 at *15. The state court further noted that immediately before making this remark the prosecutor emphasized that he had the burden of proof. *Id.* In the context of the prosecutor's entire rebuttal argument and in light of the jury instructions which clearly set forth the burden of proof, the Michigan Court of Appeals' decision was not contrary to or an unreasonable application of *Darden.* Further, Petitioner has not shown that the prosecutor's conduct was improper and therefore the trial court did not err in failing to grant a mistral on this basis.

### 5. Inadmissible Hearsay

Petitioner maintains that the prosecutor elicited inadmissible hearsay evidence when

he asked the victim what Hawkins said to her when she was persuaded to return from the hallway with Oliver-McClung.  (ECF No. 11-12, PageID.1326-27.)  Smith responded, "You've been chosen." (*Id.*)  The trial court sustained defense counsel's objection. (*Id.*)  But the prosecutor referenced this testimony in rebuttal closing argument by stating: "What does [Smith] do?  She goes outside.  The defendant ...lures her back in.  And what happens? You've been chosen." (ECF No. 11-14, PageID.1842.)  The Michigan Court of Appeals held that neither the original questioning nor the rebuttal argument was improper.  *Love*, 2016 WL 3945875 at *16.  First, the court reasoned that the  "You've been chosen" statement was not hearsay because it was not offered to prove the truth of the matter asserted.  *Id.*  Second, the court held that the prosecutor's inference that Petitioner lured Smith back inside was a reasonable inference from the evidence.  *Id.*  Lastly, the court of appeals held that even if the prosecutor's conduct was erroneous, "any prejudice was alleviated by the trial court's instructions that the lawyers' questions, statements, and arguments were not evidence."  *Id.*

The state court's decision was not contrary to, or an unreasonable application of, the *Darden* standard.  First, this Court must defer to the Michigan Court of Appeals' decision that the "You've been chosen" statement was not hearsay.  *Henness v. Bagley*, 644 F.3d 308, 326 (6th Cir. 2011) ("When reviewing a claim of evidentiary error in a federal habeas petition, [federal courts] defer to the state court's interpretation of its own rules of evidence and procedure.").  Because the testimony was properly admitted under state law, it was not misconduct for the prosecutor to elicit the testimony.  The record also supports the Michigan Court of Appeals' conclusion that the prosecutor's rebuttal argument was based upon

16

reasonable inferences from the evidence presented.

            6.    Arguing facts not in evidence and leading the witness

Next, Petitioner argues that the prosecutor improperly argued facts not in evidence. Smith described the men at the party as "being aggressive, like too much on the girls." (ECF No. 11-12, PageID.1320.) A few questions later, the prosecutor asked, "You said earlier the guys were grabbing on the girls?" (*Id.* at 1322.) Petitioner objects to the prosecutor's question because Smith had not used that exact phrasing. This, he maintains, means that the prosecutor was improperly leading the witness, and that he was incorrect in repeating in closing argument that "[Smith] told you they weren't just grabbing on me, they were grabbing on other girls too." (ECF No. 11-14, PageID.1752.) The Michigan Court of Appeals held that the prosecutor's question and argument were a reasonable inference supported by Smith's testimony. *Love*, 2016 WL 3945875 at *16. The state court's decision is fully supported in the record.

## B.    Judicial Misconduct (Claims II and III)

Petitioner's second and third claims concern the conduct of the trial judge. Petitioner argues that the trial judge improperly acted as a prosecutor when questioning Destiny Herring and that the trial judge improperly denied the defense's motion for mistrial on this basis.

Petitioner objects to the following exchange:

The court:    Okay, all right, okay. But before you went down to the police station, before you went down in this car with Carlos Love, you had texted people that Shantia Smith was complaining of possibly being raped by someone; is that right?

| | |
|---|---|
| Herring: | Yes. |
| The court: | Yes or no? |
| Herring: | Yes. |
| The court: | Okay.  So you knew when you went down to the police station that there was something amiss; that this reason that the police wanted to talk to you had to do with Shantia Smith and the contention that she may have been raped by someone, isn't that true? |
| Herring: | Not at the moment because the lady never— |
| The court: | What do you mean "not at the moment."  I don't understand what the heck you're saying, "not at the moment." What is a moment? |
| Herring: | Not at that time because she never explained it to me. |
| The court: | No, no, no.  Let's go—let's go back again. |
| Herring: | Okay. |
| The court: | You gave text messages, right, saying that Shantia Smith had complained of being raped, is that true? |
| Herring: | Yes. |
| The court: | All right.   And then you wind up going to a police station because the police want to talk to you, right? |
| Herring: | Yes. |
| The court: | How often do you go to a police station to talk to the police?  Is this an everyday occurrence? |
| Herring: | No. |
| The court: | When is the last you time you went to the Detroit Police before March 5, 2014 to give a statement to the police? |

18

| Herring: | Never. |
|---|---|
| The court: | This is a pretty rare occasion, isn't it? |
| Herring: | Yes. |
| The court: | You knew full well then when you went to the police station why they wanted to talk to you, didn't you? |
| Herring: | I really did not know at all. |
| The court: | You think we're that stupid? |

*Love*, 2016 WL 3945875 at *6-7.

The Michigan Court of Appeals held that the trial court's questions did not constitute

bias or misconduct:

> [T]he broad nature of the judicial intervention—questioning of a witness by the trial court—is not improper. *See* MRE 614(b) (permitting judicial questioning of witnesses). Such questioning can "produce fuller and more exact testimony or elicit additional relevant information." *Stevens*, 498 Mich. at 173. However, "[i]t is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally." *Id*. at 174. "It is essential that the judge not permit his own views on disputed issues of fact to become apparent to the jury." *Id*. (quotation marks and citations omitted). Further, "[a] judge should avoid questions that are intimidating, argumentative, or skeptical." *Id*. at 175.

> Although the judge's questioning exhibited clear disbelief in Herring's testimony and although some of the questioning appears to have been argumentative or skeptical, when examining the totality of the circumstances, we are not convinced that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against Love or Oliver–McClung. First, Herring was a prosecution witness, and although much of her testimony tended to favor defendants, she did testify in ways that supported the prosecution as well, including by testifying that Love went into the bedroom while Smith was in the bedroom. Hence, it is not clear that the expression of disbelief concerning one aspect of Herring's testimony was directed toward one or the other party such that it would constitute biased

judicial questioning.  Additionally, the portion of Herring's testimony with respect to which the trial court expressed disbelief, *i.e.*, whether she knew the reason why she was being called to the police station, was not central to the issue of guilt or innocence.  Further, Herring admitted numerous times at trial that she had lied to the police on multiple occasions and that she had, in fact, lied during earlier portions of her testimony.  As such, the effect of the judge's questioning was lessened by her already strained credibility.  The prejudicial effect of the questioning was also limited given that this was an eight-day trial and the judge's questioning was, in context, relatively short and isolated. Finally, the trial court also instructed the jury that its questioning of the witnesses was not meant to reflect its opinion of the evidence and that its comments, questions, and instructions were not evidence.  Given the totality of the circumstances, the court did not commit misconduct.  For these same reasons, the trial court did not abuse its discretion in refusing to grant Oliver-McClung's motion for a mistrial.

*Love*, 2016 WL 3945875, at *7-8.

An impartial judge is a necessary component of a fair trial.  *In re Murchison*, 349 U.S. 133, 136 (1955).  The Supreme Court explained the appropriate measure of judicial conduct as follows:

[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky v. United States*, 510 U.S. 540, 554 (1994).

On habeas review the inquiry focuses on whether the trial judge's conduct rendered the trial fundamentally unfair.  "To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree."  *McBee v. Grant*, 763 F.2d 811, 818 (6th

Cir. 1985).

The trial court's questioning of Herring undoubtedly showed frustration and doubt as to Herring's credibility, but it did not show "'hostility to one of the parties or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties for the purpose of furthering or supporting the contention of such party.'" *Todd v. Stegal*, 40 F. App'x 25, 28 (6th Cir. 2002) (quoting *Knapp v. Kinsey*, 232 F.2d 458, 465-67 (6th Cir. 1956)).   As the state court noted, Herring was a prosecution witness and the trial court's questions and comments were not substantially adverse to Petitioner or advantageous to the prosecutor.   Herring's credibility was already strained by her admissions that she lied to police and lied in her earlier trial testimony.

Finally, the trial judge instructed the jury that his "comments, rulings, questions and instructions are ... not evidence" and that his comments and instructions did not reflect his personal opinion about the case and should not be interpreted as an indication as to how he thought the jury should decided the case.  (ECF No. 11-15, PageID.1984.)  The trial court also instructed the jury,  "[i]f you believe that I have an opinion about how your should decide this case, you must pay no attention to that opinion.   You are the only judges of the facts, and you should decide this case from the evidence."  (*Id.*)

The Court concludes that the trial court's questions and comments did not evidence any particular bias toward the defendant and consequently did not deprive Petitioner of a fundamentally fair trial.   Thus, Petitioner's claims of judicial misconduct and error in denying the motion for mistrial do not warrant habeas relief.

21

### C.      Evidentiary Claims (Claims IV and VI)

Petitioner's fourth and sixth claims allege errors in two of the trial court's evidentiary

decisions – one admitting evidence, the other excluding evidence.

In his fourth claim, Petitioner challenges the admission of evidence concerning the

suspected arson of the apartment building where the sexual assaults occurred.  Petitioner

maintains that the evidence was not relevant because he was never tied to or charged with

arson and, even if it was relevant, it was unfairly prejudicial.

The Michigan Court of Appeals held that admission of this evidence was not

improper:

> Generally all relevant evidence is admissible.  M.R.E. 402.  "Evidence is
> relevant if it has 'any tendency to make the existence of any fact that is of
> consequence to the determination of the action more probable or less probable
> than it would be without the evidence.'" *People v. Watkins*, 491 Mich. 450,
> 470; 818 NW2d 296 (2012), quoting MRE 401. In this case, the police
> responded to the apartment building where the sexual assaults occurred.
> Although they knocked on the door and announced themselves, they received
> no answer.  Less than an hour after they left, the building burned down.  An
> arson investigator testified that the fire originated in the same part of the
> building that the sexual assaults occurred.  He was unable to determine
> conclusively what caused the fire and had no suspects; however, a police dog
> detected a petroleum-based accelerant.  Moreover, Michael Byrd, an inmate
> at the Wayne County Jail who met Oliver-McClung while they were both
> incarcerated in the jail, testified that Oliver-McClung told him that after he
> learned Smith was claiming rape, his cousin returned to the apartment building
> and set it on fire in order to get rid of DNA evidence.  According to Byrd,
> Oliver-McClung told him in detail about a method to burn the building without
> the accelerants being detected; he said that Oliver-McClung told him he knew
> the method worked because he had previously burned down his grandmother's
> house.  Byrd also testified that Oliver-McClung said that the "[p]lace went up
> in a blaze, everything burned down, so it wasn't any possible way to find the
> DNA" left on the wall when he ejaculated.  Given that this evidence makes it
> more probable that Oliver-McClung was involved in the sexual assaults, the

trial court did not abuse its discretion when it determined the evidence was relevant.

Relevant evidence can be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. *People v. Feezel*, 486 Mich. 184, 198; 783 NW2d 67 (2010) ... "All relevant evidence will be damaging to some extent.  The fact that evidence is prejudicial does not make its admission unfair."  *People v. Murphy* (On Remand), 282 Mich.App 571, 582–583; 766 NW2d 303 (2009). ...

Here, the probative value of the evidence was substantial.  It directly linked Oliver-McClung to the destruction of the apartment building and to the possible destruction of DNA evidence.  At a minimum, the evidence of a fire occurring in the building less than an hour after police left was relevant to show why DNA or other evidence was never collected from the bedroom in which the sexual assaults occurred.  Accordingly, the trial court did not abuse its discretion in admitting the evidence.

*Love*, 2016 WL 3945875 at *10.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, Supreme Court precedent.  First, to the extent that Petitioner raises this claim as a violation of state law, his claim is not cognizable on federal habeas review.  *Shoemaker v. Jones*, 600 F. App'x 979, 984 (6th Cir. 2015).  A federal court may grant an application for writ of habeas corpus only on the ground that the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States, and not for perceived errors of state law.  *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Second, Petitioner fails to show a due process violation.  The admission of evidence may violate the Due Process Clause (and thereby provide a basis for habeas relief) where the admission "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v.*

23

*Lovasco*, 431 U.S. 783, 790 (1977)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (2003).   The

Supreme Court "defined the category of infractions that violate fundamental fairness very

narrowly." *Estelle*, 502 U.S. at 73 (1991).   To violate due process, an evidentiary decision

must "offend[ ] some principle of justice so rooted in the traditions and conscience of our

people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.

2000) (citation omitted).

Byrd's testimony, if believed, connected Petitioner to the fire and established that the

motive behind the fire was to destroy evidence.   This testimony was relevant and, indeed,

damaging to the defense, but not unfairly so.   Petitioner fails to establish that the appellate

court's determination—that admission of the arson-related testimony was permissible—is

contrary to, or an unreasonable application of, clearly established federal law.   Habeas relief

is denied on this claim.

Petitioner's sixth claim concerns the exclusion of impeachment evidence.   Defense

counsel attempted to impeach Byrd with evidence that Byrd was a gang member, that he

reached out to the prosecutor's office to make a deal in exchange for the arson information,

and that he had a long history of making deals with the Wayne County prosecutor's office.

The trial court found evidence of Byrd's gang membership inadmissible and limited

questions about Byrd's deals with the prosecutor's office to only those deals made after the

date of the offense.   The Michigan Court of Appeals held that the trial court erred in

excluding this evidence but that relief was not warranted because the error was harmless.

*Love*, 2016 WL 3945875 at *10.

On federal habeas review, relief may not be granted "based on trial error unless [a petitioner] can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). "There must be more than a 'reasonable probability' that the error was harmful." *Id*. (quoting *Brecht*, 507 U.S. at 637).

Further, a state court's decision that an error was harmless constitutes an adjudication "on the merits" to which the highly deferential AEDPA standard applies. *Davis v. Ayala*, 576 U.S. 257, 269 (2015). Thus, this Court may not grant relief unless the state court's "'harmlessness determination itself was unreasonable.'" *Id*. (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)) (emphasis in *Fry* and *Davis*). *See also Langford v. Warden*, 665 F. App'x 388, 389 (6th Cir. 2016) (where the state court held that any error was harmless courts on collateral review must "give a heightened degree of deference to the state court's review of a harmless error decision").

The Court sees nothing in the record which would call into question the Michigan Court of Appeals' determination that any error was harmless. Relief is denied on this claim.

### D.  Consent Jury Instruction (Claim V)

Next, Petitioner maintains that his right to a properly instructed jury was violated when the trial court refused to instruct the jury on the defense of consent. Under Michigan law, "consent can be utilized as a defense to negate the elements of force or coercion" but

"[a]n instruction on consent is required only if there is evidence of consent." *Love*, 2016 WL

3945875, at *17 (quotations omitted).

The Michigan Court of Appeals upheld the trial court's decision that a consent

instruction was not supported by the evidence:

> Here, there was no evidence that Smith consented. Oliver-McClung, however, asserts that during the preliminary examination his attorney asked "Isn't it true that my client never forced you to have sex?" and Smith replied, "I don't know." This testimony is not substantive evidence that Smith consented to engaging in sexual intercourse with Oliver-McClung. It is impeachment evidence used to suggest that Smith's testimony at trial that she did not consent to sexual intercourse with Oliver-McClung and that he forced himself upon her was not truthful. At trial, there was no substantive evidence that she consented.[18]
>
> Oliver-McClung also suggests that the lack of injury to Smith and the testimony that she willingly went into the bedroom with Oliver-McClung and the others is evidence of consent. However, the SANE nurse testified that in the majority of CSC cases there will be no signs of injury. Further, the testimony that Smith willingly went into the room is not evidence that she then willingly consented to engage in sexual intercourse with Oliver-McClung or any of the other individuals in the room. Accordingly, neither the fact that Smith was uninjured nor the fact that witnesses testified she willingly entered the room were, standing alone, sufficient to establish consent to sexual penetration. Given that there was no substantive evidence of consent, the trial court did not err in declining to instruct the jury on consent.

---

[18]Moreover, even if we were to construe this testimony as evidence that Smith consented, we would nevertheless conclude that the jury instructions given were sufficient to fairly present the issues. In instructing the jury on the elements of CSC-I, the trial court stated that the prosecutor was required to prove that Oliver-McClung used force or coercion to commit the sexual acts. The court explained that "[f]orce or coercion means that the defendant either used physical force or did something to make [Smith] reasonably afraid of present or future danger." A defendant's use of force or coercion implies a lack of consent. *See People v. Khan*, 80 Mich.App. 605, 619 n. 5; 264 N.W.2d 360 (1978). The trial court thus implicitly instructed the jury that it could not

convict Oliver-McClung if Smith consented, given that the jury was told it could convict only if there was evidence that Oliver-McClung forced or coerced Smith. *See id*. at 619 n. 5. Accordingly, read in their entirety, the jury instructions fairly presented the issues to be tried and sufficiently protected Oliver-McClung's rights. ...

*Love*, 2016 WL 3945875, at *17.

The burden of establishing that a jury instruction error warrants habeas relief is a heavy one. To show that a jury instruction violates due process, a habeas petitioner must demonstrate "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (citations omitted). A federal court may not grant the writ of habeas corpus on the ground that a jury instruction was incorrect under state law; instead, the relevant inquiry is "whether the ailing instruction so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The jury instruction "must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72. The burden of proving that omission of a jury instruction violated due process is even heavier than that imposed on an incorrect instruction claim. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

The jury was instructed of the elements of first-degree criminal sexual conduct, including that the Petitioner engaged in an act of sexual penetration through force or coercion. (*See* ECF # 11-15, Pg.ID 2007.) This force or coercion element "implicitly

27

required the jury to find that the complainant did not consent to sexual intercourse before it could find defendant guilty." *People v. Matuszak*, 263 Mich. App. 42, 59 (2004) (quotation omitted). The jury, therefore, could not have found Petitioner guilty of first-degree criminal sexual conduct if it believed the victim consented to the sexual act. Thus, Petitioner cannot show that the trial court's decision not to give a specific consent instruction violated his right to due process.

Habeas relief is denied on this claim.

### E.      Sentencing Claims (Claims VII and VIII)

Petitioner raises two sentencing-related claims, neither of which entitle him to relief.
First, he claims that the trial court incorrectly scored offense variable 10 at ten points.  The
Michigan Court of Appeals agreed that this offense variable should have been scored at five,
rather than ten, points.  *Love*, 2016 WL 3945875 at *17.  Because correction of this error
changed the guidelines range from 135 to 225 months to 126 to 210 months, the court of
appeals remanded for resentencing.  *Id.*  This claim, therefore, is moot.

Second, Petitioner challenges the imposition of court fees and costs. Subject matter
jurisdiction exists under § 2254 "'only for claims that a person is 'in custody in violation of
the Constitution or laws or treaties of the United States.'"  *Washington v. McQuiggin*, 529
Fed. App'x 766, 772 (6th Cir. July 11, 2013) (quoting *Dickerson v. United States*, 530 U.S.
428, 439 n.3 (2000)); 28 U.S.C. § 2254(a).  A restitution order "falls outside ... the margins
of habeas ... because it is not a serious restraint on ... liberty as to warrant habeas relief."  *Id.*
at 773 (quotations omitted).  The Court lacks subject matter jurisdiction over this claim and
it is denied.

### F.      Ineffective Assistance of Counsel (Claim IX)

Petitioner argues that defense counsel was ineffective for failing to request a limiting
instruction after a police officer testified regarding a statement co-defendant Love made to
the police.  The Michigan Court of Appeals denied this claim because its factual basis was
inaccurate. *Love*, 2016 WL 3945875 at *6.  Defense counsel requested a limiting instruction
when the statement was admitted into evidence and the trial court immediately gave one. *Id.*

Petitioner fails to identify any other relevant instruction counsel should have, but did not, request and does not rebut the state court's factual finding that the requested instruction was given.  Relief is denied on his claim.

## IV.   Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability ("COA") is issued under 28 U.S.C. § 2253.  A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U .S.C. § 2253(c)(2).  A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted).  In this case, the Court concludes that reasonable jurists would not debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted.  Therefore, the Court will deny a certificate of appealability.

## V.   Conclusion

The petition for a writ of habeas corpus and a certificate of appealability are **DENIED** and the matter is **DISMISSED WITH PREJUDICE.**

**SO ORDERED**.

                                                    s/Sean F. Cox
Dated:  August 5, 2021              Sean F. Cox
                                                    United States District Judge